IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| CARL E. WATERS,<br><br>      Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,[1]<br>Acting Commissioner of Social Security,<br><br>      Defendant. | No. 16-CV-2081-LRR<br><br>**REPORT AND RECOMMENDATION** |

_____

Plaintiff Carl Waters seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. Waters argues that the administrative law judge (ALJ), Eric S. Basse, erred in evaluating whether his impairments met or equaled Listing 4.02 and in discounting some of his subjective complaints when determining his residual functioning capacity (RFC). I recommend **affirming** the ALJ's decision.

## *I. BACKGROUND*[2]

Waters suffers from cardiac problems, obesity, and diabetes. AR 11.[3] Because he takes his diabetes medications only some of the time due to financial restraints, he also

_____

[1] Commissioner Berryhill is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 14).

[3] "AR" refers to the administrative record below.

suffers from nerve damage in his hands and feet—called peripheral neuropathy—that causes tingling and numbness. AR 11, 14, 40-41, 71, 479-80.

Waters filed applications for DI and SSI benefits in March 2012, alleging disability beginning on June 20, 2010. AR 66, 76. After both applications were denied initially and on reconsideration, Waters requested a hearing before an ALJ. AR 65-93, 114. The ALJ held a video hearing on October 29, 2014, at which Waters and a vocational expert testified. AR 22-23. Waters testified that he has no problems with sitting, but he can walk only for a few minutes before he needs a break due to fatigue and shortness of breath. AR 28, 32, 41-42. He walks his dog every day for thirty minutes but testified that he must stop and rest four or five times during the course of the walk. AR 28, 41. He testified that almost all activities make him feel fatigued, including lifting things, climbing stairs, and bending over. AR 28. He is able to do housework such as dishes, laundry, and dusting, but he testified that he paces himself and works for a few minutes at a time. AR 32. Waters is able to shop at small convenience stores. AR 37-38. He testified that he has a breathing machine that he uses when he feels short of breath (usually at least once a day), and treatment takes seven to ten minutes. AR 39-40. Waters testified that the numbness and tingling in his fingers and feet make it difficult to lift things and to stand. AR 42-43. Waters estimated that he uses the computer for an hour every day, usually reading things on social media. AR 48-49.

After the hearing, the ALJ issued a written opinion following the familiar five-step process outlined in the regulations to determine whether Waters was disabled.[4] AR

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

9-17. The ALJ found that Waters's impairments did not meet or equal the listing for chronic heart failure, Listing 4.02. AR 12. To evaluate whether Waters could perform his past work or other work, the ALJ determined Waters's RFC, or "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)). The ALJ found that Waters can occasionally climb, balance, stoop, kneel, crouch, crawl, and lift things weighing no more than ten pounds. AR 12 (finding that Waters can perform sedentary work with some exceptions); 20 C.F.R. §§ 404.1567(a), 416.967(a) (defining sedentary work). The ALJ did not fully credit Waters's testimony, finding that he can occasionally stand and walk. *Id.* The ALJ also found that Waters "must avoid concentrated exposure to heat, cold, and humidity" and that he "is limited to frequent handling and fingering of his upper extremities bilaterally." AR 12.

Ultimately, the ALJ found that a significant number of jobs existed that Waters could perform and thus, that Waters was not disabled. AR 16-17. Waters appealed the ALJ's decision, and the Appeals Council denied his request for review on May 18, 2016. AR 1-3. The ALJ's decision is therefore the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Waters filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Doc. 3). *See* 20 C.F.R. § 422.210(c). The parties briefed the issues (Docs. 15, 16), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de

novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Waters argues that the ALJ erred during step three of the disability analysis because he used the wrong legal standard in determining whether Waters's impairments met or equaled Listing 4.02. Waters also argues that the ALJ erred in determining RFC, as he did not give a good reason for discrediting Waters's subjective complaints. I will address each of these arguments in turn.

### *A. Listing 4.02*

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments meet or equal a listing, that ends the inquiry: the claimant is disabled and entitled to benefits. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Waters argues that the ALJ erred in determining that his impairments do not meet or equal Listing 4.02 for chronic heart failure.

To meet Listing 4.02, the claimant's impairments must satisfy both the "paragraph A" and "paragraph B" requirements. 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02. The ALJ correctly found that Waters's consistent ejection fraction of less than 30% meets the requirements of paragraph A. 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02(A)(1); AR 12, 412, 427, 471, 568. Paragraph B requires, as relevant here:

> Three of more separate episodes of acute congestive heart failure within a consecutive 12-month period . . . , with evidence of fluid retention . . . from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency

room treatment for 12 hours or more, separated by periods of stabilization
. . . .

20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02(B)(2).[5] The ALJ employed the wrong legal standard, finding that Waters did not meet Listing 4.02 because he did not have three episodes of heart failure "within three consecutive months" (as opposed to twelve consecutive months). AR 12. The Commissioner contends this error is harmless because even under the proper standard, Waters cannot prove that his impairments meet the paragraph B requirements. *See Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (when the ALJ uses the wrong legal standard, the error is harmless if "[a] finding the other way . . . could [not] . . . have been supported by substantial evidence on the record as a whole").

Waters argues that he had three separate episodes of heart failure within twelve consecutive months, pointing to hospitalizations on September 23 to 25, 2010; January 9, 2011; and January 18 to 20, 2011. AR 255, 335-36, 351. The hospitalization on January 9, 2011, does not constitute an episode of heart failure under paragraph B for several reasons. To satisfy paragraph B, each episode must "requir[e] acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more." *Id.* § 4.02(B)(2). During the alleged episode on January 9, 2011, Waters was treated for only two hours before being discharged. AR 330, 336. Thus, his hospitalization on January 9, 2011, is not an episode of heart failure for purposes of paragraph B.

In addition, paragraph B requires that episodes of heart failure be "separated by periods of stabilization," which "means that, for at least 2 weeks between episodes of acute heart failure, there must be objective evidence of clearing of the pulmonary edema or pleural effusions and evidence that [the claimant] returned to, or [the claimant] w[as]

---

[5] Waters concedes that he does not meet the requirements for § 4.02(B)(1) and (3). Doc. 15 at 5.

medically considered able to return to, [his] prior level of activity." 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 4.00(D)(4)(c), 4.02(B)(2). The alleged episodes beginning on January 9, 2011, and January 18, 2011, are only nine days apart and thus are not separated by a sufficient period of stabilization.

Moreover, the Commissioner argues that Waters cannot prove that he satisfies the requirements set forth in the introductory paragraph to Listing 4.02. Paragraph B(2) was added to Listing 4.02 in 2006 to "include individuals who have frequent acute episodes of heart failure, showing that the heart failure is not well-controlled by the prescribed treatment." Revised Medical Criteria for Evaluating Cardiovascular Impairments, 71 Fed. Reg. 2312, 2318 (Jan. 13, 2006). Per the introductory paragraph to Listing 4.02, the claimant's episodes must occur "while on a regimen of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02; *see Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977-78 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).

At the time of his hospitalization on September 23, 2010, Waters had been diagnosed with cardiomyopathy, but not congestive heart failure, and he was taking furosemide (trade name Lasix) to treat his heart problems. AR 255. He had previously taken the antihypertensive carvedilol (trade name Coreg) and an angiotensin converting enzyme (ACE) inhibitor, but they had not helped. AR 256. During his September 2010 hospitalization, his doctors increased his daily dosage of furosemide and prescribed a daily dosage of carvedilol. AR 255. Doctors conclusively diagnosed Waters with congestive heart failure during Waters's hospitalization from January 18 to 20, 2011. AR 351. Doctors increased his daily dosages of furosemide and carvedilol and also prescribed Lisinopril, an ACE inhibitor. AR 351. A one-time consulting examiner noted in January 2013 that Waters was on the correct medications to treat his congestive heart failure. AR 480. Waters suffered an episode of heart failure from May 14 to 16, 2013, and at that time, he was still being prescribed daily dosages of furosemide, carvedilol, and Lisinopril. AR 545. The doctors additionally prescribed digoxin to control Waters's blood pressure and warfarin (trade name Coumadin), a blood thinner, to help prevent

6

strokes. AR 528, 534, 568. Treatment notes from May 2014 state that Waters "has been on optimal medical therapy for more than three months[,] including carvedilol and lisinopril." AR 565.

The Commissioner does not argue that the medications prescribed to Waters are insufficient to constitute a regimen of prescribed treatment.[6] Rather, the Commissioner argues that Waters cannot meet the requirements of paragraph B because he did not always take his medications (due to an inability to afford them). The record demonstrates that Waters often did not take the monthly prescribed amount of insulin to treat his diabetes because he could not afford it. AR 71, 479-80, 592. It is less clear whether Waters was noncompliant taking his medications to treat his congestive heart failure. The Commissioner points to a treatment note from March 2012 stating that Waters is "intermittently noncompliant with his medical regimen because of financial constraints" but has "been compliant with his medication for the last 2 months." AR 426. This statement was made in the context of discussing Waters's medical history, including his cardiomyopathy and diabetes, and it could refer solely to Waters's failure to take his diabetes medications as prescribed. *Id.* The Commissioner also points to evidence that Waters occasionally missed doses of warfarin, resulting in subtherapeutic levels of his international normalized ratio (INR), which measures the tendency of a person's blood to clot. AR 607, 609, 611, 613, 615, 617, 619. It is not clear, however, whether warfarin was part of Waters's regimen of prescribed treatment for his congestive heart failure. Waters was prescribed warfarin during an episode of heart failure and at least one doctor believed that it might improve his symptoms. AR 525-28. On the other hand,

---

[6] Waters's treatment consisting of furosemide, carvedilol, and Lisinopril, which he has been prescribed since January 18, 2011, certainly constitutes a regimen of prescribed treatment. It is less clear to me whether furosemide alone, or furosemide and carvedilol (Waters's treatments at the time of his September 2010 and January 2011 episodes), constitute a regimen of prescribed treatment. Because the Commissioner does not argue that this treatment is insufficient, however, I find that all of Waters's episodes meet the requirements of the introductory paragraph to Listing 4.02.

7

Waters was not prescribed warfarin until May 2013, more than two years after being diagnosed with congestive heart failure and being prescribed other medications to treat it. Waters's cardiomyopathy medical therapy was described as "optimal" in March 2014, despite Waters missing doses of warfarin. AR 565, 619. Treatment notes from March 2014 suggest that a new provider, aware of Waters's cardiomyopathy, asked Waters "what he was diagnosed with" to be prescribed warfarin. AR 600-01. The evidence cited by the Commissioner provides little support that Waters did not take his cardiomyopathy medications, and an ALJ could find, based on substantial evidence, that Waters satisfies the requirement of being on a regimen of prescribed treatment when his episodes occurred.

Although Waters's impairments do not meet the requirements of paragraph B and thus do not meet Listing 4.02, he argues that his impairments are equivalent to Listing 4.02. Waters can establish medical equivalence if "other findings related to [Waters's] impairment . . . are at least of equal medical significance to" the paragraph B criteria or if his impairments considered in combination "are at least of equal medical significance" to Listing 4.02. 20 C.F.R. §§ 404.1526(b)(1), (3), 416.926(b)(1), (3). An impairment or combination of impairments is equivalent to a listing if the claimant "present[s] medical findings equal in severity to *all* the criteria for the one most similar listed impairment," not if "the overall functional impact of [the] unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "For example, if a [claimant] has both a growth impairment slightly less severe than required by listing § 100.03, and is mentally retarded but has an IQ just above the cut-off level set by § 112.04, he cannot qualify for benefits under the 'equivalence' analysis—no matter how devastating the combined impact of mental retardation and impaired physical growth." *Id.* at 532 n.11.

Waters suffered episodes of heart failure in September 2010, January 2011, and May 2013. AR 255, 351, 532. Apart from the hospitalizations during those episodes, Waters has not been hospitalized for an extended period of time, whether due to his

8

congestive heart failure or his other impairments. He essentially argues that the functional impact of his impairments, in combination, equals the severity of paragraph B or Listing 4.02 as a whole. He does not explain how his impairments are equal in severity to the paragraph B criterion of three episodes of heart failure in a twelve-month period, and he does not point to any particular evidence to demonstrate equivalence to the paragraph B criterion. No doctor has opined that Waters's impairments are equivalent to Listing 4.02. In short, on this record, substantial evidence cannot support a finding of equivalence.

Because substantial evidence cannot support a finding that Waters's impairments meet or equal Listing 4.02, remand is not required for the ALJ to address Listing 4.02 using the proper legal standard.

## B. *Credibility*

Waters argues that the ALJ improperly discredited some of his subjective complaints. When evaluating the credibility of a claimant's subjective complaints—including pain, shortness of breath, or weakness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).[7] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at

---

[7] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

386. The ALJ may not discount a claimant's subjective allegations based "solely on a lack of objective medical evidence." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991). The ALJ may reject a claimant's subjective complaints, however, based on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). "The ALJ [i]s not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

Waters testified that he has no problems with sitting, but he can walk and stand for only a few minutes before he needs a break due to fatigue and shortness of breath. AR 28, 32, 41-42. The ALJ found that Waters can perform "seated work" or sedentary work. AR 12, 14. As Waters points out, however, even sedentary work requires a claimant be able to stand or walk for a total of two hours in an eight-hour day. *See* 20 C.F.R. § 404.1567(a), 416.967(a) (defining sedentary work as requiring walking and standing "occasionally"); Social Security Ruling (SSR) 96-9P, 61 Fed. Reg. 34478, 34480 (July 2, 1996) ("'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday."). The ALJ's RFC assessment does not include a need for breaks from standing or walking, suggesting that the ALJ found that Waters can stand or walk for a total of two hours with normal breaks, as needed for sedentary work.

The ALJ found that "the claimant can remain on his feet for the time required of sedentary work and longer than he alleged at the hearing" based on inconsistencies in the record as a whole. AR 14-15. Although Waters concedes that this is an acceptable reason to discount his subjective complaints, he argues that substantial evidence does not support the ALJ's finding of inconsistencies.

The ALJ suggested that Waters's testimony regarding his ability to stand and walk was inconsistent with the opinion of the consulting examiner. AR 14, 479-81. The

consulting examiner noted that Waters "estimate[d] the distance he can walk will vary by day" and that Waters reported feeling fatigued after walking the dog around the block. AR 479. The consulting examiner opined that Waters "would be well-served to lose weight and be more active." AR 480. In his RFC assessment, the consulting examiner found that Waters "has troubles with standing and walking and moving about, but he can sit for extended periods of time." AR 481. The consulting examiner did not opine on Waters's ability to stand or walk for any specific amount of time. Thus, given that the consulting examiner found that Waters would have "troubles" walking and standing, Waters's testimony regarding his limited ability to walk and stand is not inconsistent with the consulting examiner's opinion.

The ALJ also found that Waters's activities of daily living reported in a December 2012 function report were inconsistent with an inability to stand or walk for more than ten minutes at a time. AR 14, 206-13. In the report, Waters stated, "[i]f breathing permits, I will try to take dog for a walk." AR 207. He further explained that his girlfriend and her two children, with whom he lives, also care for the dog (and that it is their dog). AR 206-07. He elaborated later that he can walk about a block before needing to rest and that he rests for two to three minutes at a time. AR 211. He reported that four to five times a week, he prepares meals such as sandwiches; eggs; and frozen, microwavable dinners; and that it takes him thirty to forty-five minutes. AR 208. Waters stated that he is not able to do laundry or yard work, explaining that these activities make him short of breath but that he helps when he can. AR 208-09. He reported that he is able to go grocery shopping and that it does not take more than an hour. AR 209. He stated that he tries to "get out daily for at least an hour." AR 210.

The ALJ also found treatment notes inconsistent with Waters's testimony regarding his ability to stand and walk for only a few minutes at a time. AR 14. The ALJ pointed to treatment notes in which Waters denied having chest pain at rest or on exertion, but this is not inconsistent with Waters feeling fatigued or short of breath. AR 14, 256, 337, 354, 564. The ALJ also relied on treatment notes reflecting Waters's

11

complaints of shortness of breath. AR 14. In September 2010 (during an episode of heart failure), Waters stated that he sometimes feels short of breath upon exertion, but it is not consistent. AR 256. An electrocardiogram (EKG) test demonstrated that "[w]ith stress, the patient experienced dyspnea" (shortness of breath). AR 286. These stress test results were obtained prior to Waters being prescribed all the medications now used to control his congestive heart failure. AR 255-25, 351. On January 9, 2011, Waters complained of moderate difficulty breathing that worsened with activity. AR 337. On January 18, 2011, Waters suffered another episode of heart failure and felt short of breath at rest that worsened upon exertion. AR 374-75. After that episode, he was diagnosed with congestive heart failure and put on a regimen of medications to treat his heart failure. AR 351. On February 10, 2011, he reported that after being discharged from the hospital, "he is able to walk for as far as he wants to and is able to walk up several flights of stairs." AR 401. At the end of March 2011, he reported continuing to feel short of breath. AR 405. In April 2011, he reported "that his symptoms are better than they had been" and that "[h]e is able to walk his dog around the neighborhood" but that he still has difficulties going up stairs and exercising. AR 413.

Treatment notes from March 2012 reflect that Waters's medications were adjusted because he reported experiencing worsening shortness of breath upon exertion. AR 422, 426. He said that he felt "short of breath with minimal activity" and that he could not climb stairs. AR 432. In July 2012, Waters denied feeling short of breath and stated that medications helped his symptoms. AR 462. In May 2013, Waters suffered another episode of heart failure that required hospitalization for a few days. AR 544-45. During that episode, he experienced "increased dyspnea on exertion, to the point of being short of breath when at rest." AR 533. About two weeks after he was discharged, he reported that since his release from the hospital, he had not felt short of breath on exertion. AR 504. In March 2014, he denied having problems with shortness of breath during a check-up related to his diabetes and heart problems. AR 600-01. He similarly denied feeling short of breath in April 2014, and he also reported walking five to six times a week for

thirty minutes at a time, as well as walking the dog twice daily for thirty minutes at a time. AR 596. In May 2014, he reported feeling short of breath only upon moderate to severe exertion. AR 564. Treatment notes from August 2014 reflect that he felt short of breath in humid weather, but inhaler use improved his symptoms. AR 592. As noted by the ALJ, after Waters was prescribed warfarin in May 2013, he routinely denied having shortness of breath or activity level change during his monthly check-ups to monitor his warfarin dosage. AR 607, 609, 611, 613, 615, 617, 619.

Substantial evidence supports the ALJ's determination that Waters is not as limited as he testified and that he would be able to stand and walk for the time required of sedentary work (two hours in an eight-hour day). Although treatment notes reflect that Waters sometimes feels shortness of breath at rest or upon minimal exertion, the ALJ could find that this was not the norm for Waters (especially because such instances usually resulted in his medications being adjusted). Treatment notes demonstrate that Waters sometimes denied feeling short of breath at rest or when he walked. He reported on multiple occasions being able to walk his dog for thirty minutes without mentioning the need to rest. I recommend denying Waters's challenge to the ALJ's credibility determination.

### III. CONCLUSION

I recommend that the district court **affirm** the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and

Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 10th day of July, 2017.

_____
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa